28 C.C.P.A. (Patents)

### In re WRIGHT.
### Patent Appeal No. 4401.

Court of Customs and Patent Appeals.

Feb. 24, 1941.

R. G. Story, of Beacon, N. Y., for appellant.

W. W. Cochran, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

Appellant filed in the United States Patent Office an application for a patent relating to recovering phosphate values from phosphate wash or debris. The claims which were finally rejected, and which are the subject matter of the appeal here, are numbered 2, 3, 4 and 5. The Board of Appeals affirmed the rejection of said claims by the Primary Examiner and appellant has appealed here from the board's decision.

While Claim 2 is regarded as illustrative of all the appealed claims, particular features of claims 3, 4 and 5 will be referred to herein later. Claim 2 reads:

"2. The method of recovering phosphate values from feed which comprises dividing the feed into a coarse fraction and a fine fraction, selectively oiling the phosphatic values of the fine fraction, aerating the treated fine fraction and removing the phosphate values in the form of a froth, selectively oiling the phosphate values of the coarse fraction, forming agglomerates, and separating the agglomerates from the non-phosphatic material."

The references relied upon are: Hall et al., 2,113,727, April 12, 1938; "Milling Methods and Cost, Phosphate Recovery Corporation" by H. S. Martin in "Milling Methods" (1934) Vol. 112, Transactions of American Institute of Mining and Metallurgical Engineers, New York (1935) pp. 466 to 474.

Phosphate in the Florida field is excavated by the use of a hydraulic gun. The loosened material is pumped to a washer where it is screened and separated according to size. The small phosphate grains, of the same size as sand grains, as well as other small grains of varying sizes, ofttimes are not recovered in the first operation and were formerly wasted with the debris. This debris is the material to which appellant applies his process for the purpose of recovering phosphate. Appellant's process is defined by appellant in his brief as follows: "In accordance with the present invention, the debris is first separated into coarse and fine fractions by means of a sizer while simultaneously desliming the fractions to remove the clay. The fine fraction is treated by the flotation method and the coarse fraction by the agglomeration method. In both the flotation method and the agglomeration method, the fractions are contacted with reagents, such as soap and oil, which selectively oil the phosphate grains. The smaller phosphate particles in the oiled fine fraction are separated by aerating the resulting slushy mass, whereby the oiled phosphate grains are carried to the surface by adhering air bubbles and may be skimmed off as a froth. The larger phosphate particles in the oiled coarse fraction are separated by segregating the agglomerates of oiled phosphate grains by underwater screening."

The Primary Examiner held that claim 2 was rejectable on Martin and stated that it read directly on the procedure described in the Martin publication.

Appellant urges that his invention differs from that of Martin essentially in the use

of an underwater screen instead of Wilfley tables and in the retreatment of the fines from the screen by flotation. It will be noticed that there is nothing in any of the claims relating to an underwater screen, nor is there anything in any of the claims, except claim 5, relating to separation by a screen of any kind. Appellant further states that the claims should be read in the light of the disclosure, and that when so read, the agglomeration step, which is employed in the treating of the coarse fraction, is peculiar to appellant's process.

The board stated the issue presented and decided it in the following language:

"The primary question before us for consideration is whether the Martin publication discloses the method set forth in the above-copied claim [2].

"The only controversy is as to whether or not the last separation step of this claim is shown in this reference. Appellant contends that the reference on page 470 to a treatment with reagents 'just as the flotation feed is treated' indicates that the last separation of Martin was by flotation rather than agglomeration. There seems to be no question but that the same character of reagents may be employed both for flotation and for agglomeration. We believe that the reference to floccules and stratifying classification, together with the employment of riffles, indicates an agglomeration separation rather than that of flotation. We are also of the opinion that the discussion which appears a few lines farther down on page 470, with respect to a more efficient separation by grinding to proper size and then employing the regular flotation machines, is an indication that the separation step under consideration is not by flotation. We also believe that the decision in the Martin v. Chapman and Littleford case, referred to by the Primary Examiner, supplies additional reasons for holding that Martin shows an agglomeration separation as terms employed in the agglomeration separation discussed in that decision are similar to those found on page 470 of the Martin publication.

"We are satisfied that if claim 2 reads on the Martin publication, the other three claims do not patentably distinguish thereover."

While the board did not go into as much detail as did the examiner, we think it has correctly stated the issue and properly decided it. The reference Martin shows that he divides the material into coarse fractions and fine fractions. The fine fractions are oiled, i. e. mixed with a flotation reagent and are aerated or treated in a froth flotation cell with air in the usual manner, and agglomerates are then separated on a table.

Appellant argues that the agglomeration step or the last step referred to in claim 2 is peculiar to his process and does not read upon Martin. He suggested before the examiner that the statement "The plus 20-mesh material is treated with reagents just as the flotation feed is treated" shows that Martin did not appreciate the difference between the two processes. To this the examiner answered: "* * * In this connection it should be noted that the applicant does not give any specific instructions as to the reagents to be used either as to their nature or their quantities. The applicant states that froth flotation is accomplished with soap and oil or caustic, fatty acid and unsaponifiable oil, exactly as described by Martin. The agglomeration reagents, he states, are the same as in the McCoy patent, which are 'an emulsion of soap and oil such as for instance, any kind of cheap mineral oil, such as fuel oil, and any fatty acid or rosin soap, preferably the former.' The reagents used by applicant in his agglomeration process are thus the same as used in applicant's flotation process. The expression of Martin, 'The plus 20-mesh material is treated with reagents just as the flotation feed is treated' is an apt description of applicant's procedure as set forth in the claim."

On this phase of the case the board, as will be noted from the quotation heretofore made of its decision, said that the same character of reagents may be employed in flotation as in agglomeration and that by the reference of Martin to "floccules and stratifying classification, together with the employment of riffles" he "indicates an agglomeration separation rather than that of flotation."

As further proof that the agglomeration step was old, the examiner said: "* * * The applicant acknowledges the agglomeration process by oiling followed by either underwater screening as shown in McCoy patent 2,017,468, or by tabling as shown by the Chapman and Littleford patent 1,968,008 to be old as well as the froth flotation process as applied to Phosphate."

The board approved this holding and said: "* * * We also believe that the

decision in the Martin v. Chapman and Littleford case [71 F.2d 174, 21 C.C.P.A., Patents, 1187] referred to by the Primary Examiner, supplies additional reasons for holding that Martin shows an agglomeration separation as terms employed in the agglomeration separation discussed in that decision are similar to those found on page 470 of the Martin publication."

The board held in substance that the other three claims, which differ in respects hereinafter referred to, were not distinguishable over claim 2.

Claim 3 is identical with claim 2 except that in claim 3 there is a final additional step "and thereafter subjecting the tailings of the agglomeration step to flotation." The examiner pointed out that the Hall et al. patent clearly teaches the application of froth flotation to the treatment of agglomeration tailings and that the application of such flotation step to the tailings of Martin would be an obvious expedient. The board made a general affirmance of the holding of the examiner, and we agree that the last step does not lend patentability to the claim.

Claim 4 is identical with claim 2 except that the last two steps are reversed. We do not think this is the kind of process where the reversal of the order of the steps does or is even claimed to do anything which produces a new, useful and patentable result. This court has had occasion to consider a number of cases where the reversal of the order of the steps was depended upon to lend patentability. In Re Eddins, 53 F.2d 528, 19 C.C.P.A., Patents, 731, a claim for a process which consisted of "first in boring the rough log, and thereafter shaping the sides" was held to be unpatentable over the prior art process in which the practice had been to square the log first and then bore it. The same principle is announced in Re Lang et al., 97 F.2d 626, 25 C.C.P.A., Patents, 1322.

Claim 5 attempts to distinguish from the other claims by reciting that the coarse fraction is defined as being of 48-mesh or coarser and the fine mesh is defined as being of 48-mesh or finer. The Martin disclosure states that the screening material should be finer than 35-mesh and applicant states that either 35-mesh or 48-mesh may be used. It is not claimed that the 48-mesh size is critical. We think that claim 5 is not inventive over the prior art.

It follows that the decision of the board, affirming that of the examiner in rejecting the appealed claims, should be, and it is affirmed.

Affirmed.